IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MATTHEW DEYELL, individually and
on behalf of all others similarly
situated,

     Plaintiff,

v.

HISENSE USA CORP.,

     Defendant.

CIVIL ACTION NO.
1:24-cv-4363-AT

## ORDER

This matter—a putative class action arising out of the sale of thousands of allegedly defective Smart Televisions—is currently before the Court on Defendant Hisense USA Corp.'s ("Hisense") Motion to Compel Arbitration and Dismiss or, in the Alternative, to Stay the Action (the "Motion"). [Doc. 8]. For the reasons below, the Court will **GRANT** the Motion and will **STAY** and **ADMINISTRATIVELY CLOSE** this matter pending arbitration.

## I.    BACKGROUND

This action arises from the sale of thousands of Hisense 4K Android Smart TVs, manufactured between 2019 and the filing of the instant suit in 2024. (Compl., Doc. 1 ¶ 2). Plaintiff Matthew Deyell broadly alleges that the Smart TVs at issue "were manufactured by Defendant Hisense with a defective main board, causing the Class Smart TVs to suffer performance issues, such as lagging,

sluggishness, and continuous crashing of the software." (*Id.*). Plaintiff further alleges that "Hisense sold and continues to sell [these] Smart TVs despite its awareness of the [d]efect" and "has failed to issue a recall of the inherently defective main boards or reimburse Class Smart TV owners for the inevitable failure of this critical part." (*Id.* ¶¶ 7–8).

In October 2020, Mr. Deyell purchased a Hisense H8G Series 4K Android Smart TV from his local electronics store for roughly $400. (Compl., Doc. 1 ¶ 46). His purchase was covered by a one-year limited warranty. (*Id.* ¶ 47; *see also* Warranty, Doc. 17-1). Plaintiff alleges that in February 2022—sixteen months after his purchase—he "began seeing messages on his television notifying him that the television had insufficient memory." (Compl., Doc. 1 ¶ 48). He contacted Hisense's customer support, who provided him with a firmware update for his Smart TV; that update only exacerbated the issue, causing the TV to shut down. (*Id.* ¶¶ 49–50). Subsequently, "Hisense informed Mr. Deyell that because his warranty had expired, it would be unable to repair his unit." (*Id.* ¶ 53). "Mr. Deyell replied that it was his understanding a defective mainboard would be covered even outside of warranty." (*Id.*). Eventually, Hisense directed Plaintiff to a third-party service provider affiliated with it, which, according to Mr. Deyell, issued him a new mainboard for his Smart TV that was also defective. Mr. Deyell indicates that he "never received reimbursement for his out-of-pocket expenses or for his lost time spent attempting to have [his Smart TV] repaired." (*Id.* ¶ 55).

Mr. Deyell alleges that his experience is representative of a broader trend of defects in Defendant's Smart TVs, contending that "[m]any purchasers of Class Smart TVs have spent hundreds of dollars on defect-related repairs and related expenses." (Compl., Doc. 1 ¶ 37). He further alleges that Hisense has long been "on notice of the defective performance of its Class Smart TVs" due to a plethora of negative reviews across sales platforms. (*Id.* ¶¶ 24–28). Plaintiff contends that reasonable consumers expect a television's main board to last the lifetime of a TV, between five and seven years. (*Id.* ¶ 35). Thus, Plaintiff alleges, "[t]he durational limitations in Hisense's Limited Warranty, as applied to Plaintiff and Class Members, are unconscionable [because] Hisense knew about the inherent defect in the main boards at various points." (*Id.* ¶ 38). Plaintiff says that "[d]espite its knowledge, Hisense has failed to issue a recall of the inherently defective main boards or reimburse television owners for the inevitable failure of this critical part." (*Id.* ¶ 44).

In September 2024, Mr. Deyell filed a class action complaint on behalf of a nationwide class of: "[a]ll natural persons who purchased in the United States a 2019 – present Hisense 4K Google OS Smart TVs, including the H8, F and G series, H9, F and G series, H65, U6, including the U6H and U6K models, U8, including the U8N, and the A6 series." (*Id.* ¶ 56). He also set forth a putative New York subclass in his complaint. (*Id.*). According to Mr. Deyell, "it is estimated that at least hundreds of thousands of persons purchased Class Smart TVs." (*Id.* ¶ 59).

Mr. Deyell brought six claims for relief against Hisense. These include: (1) violation of the Magnuson–Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq.*, on his own behalf and the nationwide class; (2) breach of express warranties, on his own behalf and the nationwide class or, alternatively, the New York subclass; (3) breach of implied warranty, on his own behalf and the nationwide class or, alternatively, the New York subclass; (4) equitable injunctive and declaratory relief, on his own behalf and the nationwide class or, alternatively, the New York subclass; (5) unfair and deceptive trade practices in violation of New York law, N.Y. Gen. Bus. Law §§ 349 *et seq.*, on his own behalf and the New York subclass; and (6) unjust enrichment, on behalf of the nationwide class or, alternatively, the New York subclass.

In December 2024, Defendant Hisense filed a Motion to Compel Arbitration and Dismiss or, In the Alternative, to Stay Action. [Doc. 8]. After submission of an opposition (Doc. 12), reply (Doc. 14), and copies of the written warranties at issue (Docs. 16; 17), the Motion is now fully briefed and ripe for consideration.

## II.    LEGAL STANDARD[1]

"In 1925, Congress enacted the Federal Arbitration Act ('FAA'), 9 U.S.C. Sections 1 *et seq.*, to overcome judicial resistance to arbitration, and to declare a

---

[1] The parties implicitly agree that Georgia law applies to their dispute concerning contract formation. (*See generally* Mot. for Arb, Doc. 8 at 7; Opp'n, Doc. 12 at 7). Thus, the Court will apply Georgia law in reviewing the question of contract formation. *See Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016) (applying Georgia law to contract formation dispute where "plaintiff asserts, and defendant appears to agree, that Georgia law applies").

national policy favoring arbitration of claims that parties contract to settle in that manner." *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1345 (11th Cir. 2017) (cleaned up). "[T]he FAA creates a 'presumption of arbitrability' such that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (*quoting Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115–16 (11th Cir. 2014)). However, this "presumption" is inapplicable when the dispute is whether an agreement to arbitrate has been formed in the first instance. *Birch*, 861 F.3d at 1346. This is because "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). "Courts apply state contract law to questions regarding the validity, revocability, and enforceability of arbitration agreements." *Antonetti v. Activision Blizzard, Inc.*, 764 F. Supp. 3d 1309, 1315 (N.D. Ga. 2025).

Put briefly, "[o]n a motion to compel arbitration, a court undertakes a two-step inquiry to determine (1) whether the parties agreed to arbitrate the dispute in question and, if they did, (2) whether legal constraints external to their agreement foreclose arbitration." *Antonetti*, 2025 WL 359323, at *2 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). "When an arbitration agreement clears both prongs of the FAA test, a court must either stay or dismiss the lawsuit and compel arbitration." *Id.* (citing *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008)).

5

In analyzing whether the parties reached an agreement to arbitrate, district courts employ a "summary judgment-like standard" and "may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if there is no genuine dispute as to any material fact concerning the formation of such an agreement." *Bazemore*, 827 F.3d at 1333. "[C]onclusory allegations without specific supporting facts have no probative value for a party resisting summary judgment." *Id*.

## III.    DISCUSSION

### A. Ms. Guan's Declaration

As a preliminary matter, Plaintiff asserts that the Declaration of Shuang (Grace) Guan (Doc. 8-1) may not be considered by the Court at this juncture because Ms. Guan lacks the requisite personal knowledge to opine on Plaintiff's experience using his Smart TV. Ms. Guan's Declaration indicates she is "employed in the position of Senior Director, R&D Consumer Electronics Division for Hisense" and also functions as the company's custodian of records. (*Id*. at 2–3). At summary judgment, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Plaintiff asserts that Ms. Guan cannot attest "even whether it was Plaintiff himself who purportedly accepted the Terms and Conditions before using the Smart TV." (Opp'n, Doc. 12 at 19). But Mr. Deyell also asserts in his declaration: "I

6

did not see the agreement when I set up my device . . . ." (Declaration of Matthew Deyell ("Deyell Decl."), Doc. 12-1, ¶ 5).

Ms. Guan represents that "as a custodian of records, [she has] personal knowledge regarding: (a) how Hisense maintains and handles its End User Terms and Conditions ('Terms and Conditions')" and "(b) when and how a consumer must accept Hisense's Terms and Conditions to be able to use any Device purchased by that consumer." (Guan Decl., Doc. 8-1 ¶ 2). In turn, Plaintiff argues that "Guan's position cannot validate under what conditions Plaintiff purportedly accepted the Terms and Condition." (Opp'n, Doc. 12 at 19). Ms. Guan's declaration, however, does address how execution of the contract terms and conditions is handled in the course of the customer's setting up a television. Specifically, she states that "Plaintiff could not have set up and used his Smart TV without first accepting the then applicable Terms and Conditions." (Guan Decl., Doc. 8-1 ¶ 5).

In other words, Ms. Guan "did not have to be in the room with [Plaintiff] when [he] enrolled," as she possesses firsthand knowledge of how the registration process works. Her "knowledge of the [setup] process, including [what] a person must complete to [set up their device], is sufficient firsthand knowledge upon which to base the declaration." *Hunt v. Experian Info. Sols. Inc.*, 2025 WL 104324 at *4 (M.D. Ga. Jan. 15, 2025). "Contrary to Plaintiff's argument, [Ms. Guan] is not speculating as to what Plaintiff accessed, saw, or clicked" in the course of the set-up process, "but is rather asserting what was necessary" to set up his device, as demonstrated in the visual of the set-up process and terms discussed *supra* in

7

Section III.B. *Id.* (cleaned up). Subject to this qualification regarding the limits of Ms. Guan's testimony and absence of her actual first-hand observation of Mr. Deyell, the Court will not exclude Ms. Guan's declaration from consideration.

## B. Formation of Agreement to Arbitrate

Moving to the heart of Defendant's Motion to Compel Arbitration, the Court now considers whether the parties entered into a valid arbitration agreement. Under Georgia law, a valid contract requires "parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1; *see also Moreno v. Strickland*, 567 S.E.2d 90, 92 (2002). "Unless and until a meeting of the minds is reached on all essential terms, a contract is incomplete and unenforceable." *S. Cent. Steel, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 263 F. App'x 806, 808 (11th Cir. 2008) (citing O.C.G.A. § 13-3-2). "In determining whether there was a mutual assent, courts apply an objective theory of intent[.]" *Legg v. Stovall Tire & Marine, Inc.*, 245 Ga. App. 594, 596 (Ga. Ct. App. 2000). And because Hisense seeks to enforce the agreement at issue, it "is defendant's burden under Georgia law to prove the existence and terms of the contract it wishes to enforce." *Bazemore*, 827 F.3d at 1334.

The parties' dispute as to the presence of mutual assent hinges on whether Plaintiff was sufficiently on notice of the Terms and Conditions to manifest his assent to them. Defendant asserts that "[b]efore accessing and using any [Hisense] Device, a consumer must first agree to and accept Hisense's then applicable Terms

and Conditions." (Mot. for Arb., Doc. 8 at 2). Users see the below screen during

setup of their Hisense devices:



(Guan Decl., Doc. 8-1, Ex. 3, at 54).[2] Plaintiff does not dispute the information

contained in this exhibit but indicates that it "does not adequately depict the

manner in which consumers view it." (Opp'n, Doc. 12 at 10).

The above screen represents a "clickwrap" agreement, or "one in which an

internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept'

---

[2] For ease of reading, the on-screen text reads: "Your use of this device is governed by End User Terms and Conditions, and the Privacy Policy. Please review these documents carefully by clicking on the button below. You must agree to and acknowledge your acceptance of these Terms and Conditions, and the Privacy Policy, to proceed with set-up. By using this device or by downloading a software update, each as applicable, you are agreeing to be bound by these Terms and Conditions, and the Privacy Policy. You may access this document at any time by vising the settings menu." The links to the right of the text read "Accept" and "View Terms and Conditions, Privacy Policy." (Guan Decl., Doc. 8-1, Ex. 3, at 54).

button, with a link to the agreement readily available." *Hawkins v. CMG Media Corp.*, 2024 WL 559591, at *2 (N.D. Ga. Feb. 12, 2024). "Web-based 'click-wrap' agreements are an acceptable way to manifest assent to be bound by a contract 'as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement.'" *Hunt*, 2025 WL 104324, at *4. "In the internet context, the Georgia Court of Appeals has held that hyperlinked terms and conditions appearing on registration pages are generally enforceable 'if a reasonable [person] would know that more information would be found if he clicked upon the hyperlink.'" *Id.* at *2 (quoting *Thornton v. Uber Techs., Inc.*, 858 S.E.2d 255, 258 (Ga. Ct. App. 2021)); *see also Newton v. Experian Info. Sols., Inc.*, 2025 WL 2102084, at *2 (11th Cir. 2025). As the Eleventh Circuit has held in interpreting Georgia law in the context of clickwrap agreements, "a proponent of arbitration must provide evidence of the content of the terms, how the terms were displayed, and that the party providing this information had personal knowledge of these facts."[3] *Id.* at *2 (quoting *Bazemore*, 827 F.3d at 1330–31).

The Court finds that the above-depicted TV screen, with two links—one to review the Terms and Conditions and another to acknowledge acceptance of the agreement—gave Plaintiff a sufficient opportunity to review the contract terms and conditions prior to his clicking the "Accept" link. The full-screen message explicitly

---

[3] Prior to issuing this Order, the Court requested Defendant supply documentation to demonstrate the precise information that would have been provided to Plaintiff once he clicked on the "Accept" button. (Doc. 18). The exhibit provided by the Defendant demonstrated that a user would not encounter the Terms and Conditions again after clicking "Accept." (Doc. 19-3).

warns users that consumers "must agree to and acknowledge your acceptance of these Terms and Conditions, and the Privacy Policy, to proceed with set-up." (Guan Decl., Doc. 8-1, Ex. 3, at 54). Consumers then only have two options: they may click "Accept" *or* they may click "View Terms and Conditions, Privacy Policy." The full Terms and Conditions of the contract are shown if the consumer clicks the "Terms and Conditions" button—but are not shown under the "Accept" button.

The Court recognizes that, in this case, the linked agreement terms under the "View Terms and Conditions" tab are detailed, and presented in compressed font and single spacing, thus discouraging the consumer's reading of the full document. Further, there is no table of contents for the lengthy contract terms. (*See* Docs. 8-1 at 8; 19-2 at 2). In other words, finding and reviewing the section of the "Terms and Conditions" that includes the arbitration provision requires a careful review exercise on the consumer's part. The compulsory arbitration provision appears for the first time on page 8 of each version of the Terms and Conditions. (*See* Doc. 8-1). Moreover, if the consumer happens to click the "Accept" button first before reading the Terms and Conditions—as apparently occurred in the instant case—that effectively ends the consumer's capacity to pause or negate his agreement to the terms of the contract.

"Federal courts routinely enforce internet agreements where, as here: (1) the user is required to affirmatively acknowledge the agreement before proceeding with use of the website [and purchased item], or (2) the website puts a reasonably prudent user on inquiry notice of the terms of the contract, which depends on the

design and content of the website and the agreement's webpage." *Tadic v. Experian Info. Sols., Inc.*, 2019 WL 11499103, at *2 (N.D. Ga. Mar. 13, 2019). Under Georgia law, an individual's failure to read the contract's terms and conditions with a party "with whom there exists no fiduciary or confidential relation [] can not defeat an action based on it, or have it canceled or reformed on the ground that it does not contain the contract actually made . . . [unless] his failure to read it was brought about by some misleading artifice or device perpetrated by the opposite party, amounting to actual fraud such as would reasonably prevent him from reading it." *Thornton*, 858 S.E.2d at 258 (quoting *Lovelace v. Figure Salon*, 345 S.E.2d 139 (Ga. Ct. App. 1986)).

"[A]n arbitration provision [may not] be singled out 'for suspect status.' [Rather, states] must ensure 'such provisions [are] placed upon the same footing as other contracts.'" *Ruthrauff v. Luminess Direct, LLC*, 2018 WL 11447828, at *7 (N.D. Ga. Dec. 6, 2018) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).[4] "In sum, '[t]he evidence indicates that Plaintiff assented to the contract as a whole, including the arbitration clause,' when [he] agreed to the Terms—by affirmatively clicking the 'accept' button" without having apparently

---

[4] Though the Court came to the opposite result in *Ruthrauff*—denying Defendant's Motion to Compel Arbitration—"the result [t]here [was] primarily driven by Defendant's failure to submit the requisite evidence in order for the Court to conduct an independent review and analysis," including the recorded message that notified consumers of the relevant terms and conditions. *Ruthrauff v. Luminess Direct, LLC*, 2018 WL 11447828, at *7–8 (N.D. Ga. Dec. 6, 2018).

reviewed the terms and conditions. *Hunt*, 2025 WL 104324, at *5 (quoting *W.L. Jorden & Co. v. Blythe Indus., Inc.*, 702 F. Supp. 282, 284 (N.D. Ga. 1988)).

Plaintiff assented to the contract on a computerized television device that provided links on its screen to a "Terms and Conditions" button as well as a separate "Accept" button. Plaintiff argues that "notice of [the] arbitration provision" specifically was "inconspicuous," undercutting any notice or assent. (Opp'n, Doc. 12 at 10 ("When Plaintiff set up his Smart TV, nowhere did the notice highlight that it contains an arbitration clause[.]")). The Court furthermore notes that once Plaintiff clicked the "Accept" link prior to reviewing the contract terms and conditions, he was effectively contractually foreclosed from challenging the arbitration terms of the agreement that were set forth in the "View Terms and Conditions" link, which provides all details and conditions associated with the contract—including the arbitration requirements. That said, the record does not reflect any evidence that suggests Plaintiff endeavored to review the arbitration requirements until more than a year after his purchase of the television.

## C. Conscionability of Agreement to Arbitrate

Having ruled that the parties mutually assented to the Agreement—including the arbitration clause—the Court will not address Plaintiff's assertion that "[t]he arbitration clause at issue here is both procedurally and substantively unconscionable." (Opp'n, Doc. 12 at 15). "First, there is nothing inherently unfair or oppressive about arbitration clauses." *Coleman v. Prudential Bache Sec., Inc.*, 802 F.2d 1350, 1352 (11th Cir. 1986). Moreover, "[c]laims alleging

unconscionability, coercion, or confusion in signing the agreement generally should be determined by an arbitrator because those issues go to the formation of the entire contract rather than to the issue of misrepresentation in the signing of the arbitration agreement." *Id.*

Plaintiff points out that the Eleventh Circuit has previously identified an exception to this rule, where an agreement includes a class action waiver and "[w]ithout the benefit of a class action mechanism, the subscribers would effectively be precluded" from bringing suit because attorneys' fees are not recoverable. *Dale v. Comcast Corp.*, 498 F.3d 1216, 1224 (11th Cir. 2007); (Opp'n, Doc. 12 at 16). But given intervening Supreme Court precedent, the Eleventh Circuit has since walked back that reasoning. "In *Concepcion*, the Supreme Court held that the FAA preempted a California judicial rule that made most class arbitration waivers unconscionable." *Thomas v. Citi Trends, Inc.*, 2025 WL 817127, at *6 (S.D. Ga. Mar. 14, 2025) (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011)). The Eleventh Circuit followed suit, holding that "in light of *Concepcion,* [a] class action waiver in [an] arbitration agreement[] is enforceable under the FAA." *Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205, 1207 (11th Cir. 2011). In other words, the presence of a class action waiver in the parties' warranty does not require the Court to rule the agreement unconscionable.

### D. Justiciability of MMWA Claim

Thus far, the Court has found that Plaintiff agreed to the Terms and Conditions, including the arbitration clause, and thus that his state law claims

must be sent to binding arbitration. The Court now turns to the disputed issue of whether Plaintiff's claim under the Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 *et seq.*, is also arbitrable.

The MMWA authorizes a civil suit by a consumer to enforce the terms of an implied or express warranty. 15 U.S.C. § 2310(d)(1). But "[t]he Act does not provide an independent cause of action for state law claims, only additional damages for breaches of warranty under state law." *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1289 (N.D. Ga. 2018) (quoting *McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1364 (N.D. Ga. 2013)).[5]

The parties disagree about whether this Court properly has subject matter jurisdiction over Plaintiff's MMWA claim. Under the MMWA, "[n]o claim shall be cognizable in a suit [in federal court] . . . if the action is brought as a class action, and the number of named plaintiffs is less than one hundred." 15 U.S.C. § 2310(d)(3)(C). Defendant asserts that Plaintiff's MMWA claim lacks subject matter jurisdiction because it fails to meet the law's requirement of 100 plaintiffs—having only one, Mr. Deyell. Plaintiff, conversely, argues that the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332, supersedes that MMWA requirement. (*See* Compl., Doc. 1 ¶ 19 (asserting subject matter jurisdiction under CAFA)). CAFA allows for federal subject matter jurisdiction in class action suits where minimal

---

[5] Claims under the MMWA thus "stand and fall with [the plaintiff's] express or implied warranty claims under state law." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008).

diversity exists and the amount-in-controversy exceeds $5 million. 28 U.S.C. § 1332(c)(1).

"There is a split of authority assessing the interplay between CAFA and MMWA numerosity requirements, and the Eleventh Circuit has yet to consider the issue." *Monopoli v. Mercedes-Benz USA, LLC*, 2022 WL 409484 at *6 (N.D. Ga. Feb. 10, 2022) (Grimberg, J.) (quoting *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1206 (S.D. Fla. 2021)).[6] Two judges in this district, however, have considered the issue and agree that "the result here is compelled by the plain text of the MMWA." *Id.*; *see also Sowa v. Mercedes-Benz Grp. AG*, 764 F. Supp. 3d 1233 (N.D. Ga. 2024) (Geraghty, J.).

In *Monopoli*, the court held that the MMWA's numerosity requirement controlled: "A legislature's intent to repeal a statute must be 'clear and manifest.' Although CAFA was enacted thirty years after MMWA, CAFA does not demonstrate any intent by Congress to repeal or alter parts of the MMWA's jurisdictional requirements." *Monopoli*, 2022 WL 409484, at *6 (quoting *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1035 (9th Cir. 2020) (holding CAFA's numerosity requirement did not supersede MMWA requirement of 100 named plaintiffs)).

---

[6] At least three appeals courts have considered the issue and split in results. *See Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027 (9th Cir. 2020) (holding CAFA's numerosity requirement did not supersede MMWA requirement of 100 named plaintiffs); *Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 183 (3d Cir. 2023) (same). *Cf. Kuns v. Ford Motor Co.*, 543 F. App'x 572, 574 (6th Cir. 2013).

*Sowa* came to the same conclusion with similar reasoning. There, the court noted that "'a repeal by implication' requires a finding that the two statutes conflict," a conclusion that "courts must not reach lightly. If any interpretation permits both statutes to stand, the court must adopt that interpretation, 'absent a clearly expressed congressional intention to the contrary.'" *Sowa*, 764 F. Supp. 3d at 1277 (quoting *Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Engineers*, 619 F.3d 1289, 1299 (11th Cir. 2010)). The court found no irreconcilable conflict between the statutes and, thus, "[could not] conclude that CAFA impliedly repealed the MMWA's express numerosity requirement." *Id.* (citing *Floyd*, 966 F.3d at 1035 ("[T]he statutory language of the MMWA and of CAFA is not irreconcilable—the MMWA simply prevents claims under that Act from proceeding in federal court absent the satisfaction of certain jurisdictional prerequisites.")).

This Court reaches the same conclusion. CAFA's numerosity requirement does not evince an intent to supersede MMWA's requirement that a putative class action under the statute include at least 100 named plaintiffs. As such, because Mr. Deyell is the only named plaintiff attached to his class action MMWA claim, that claim is not cognizable in this Court.[7] Plaintiff's MMWA claim is therefore

---

[7] Because this Court lacks subject matter jurisdiction over Plaintiff's MMWA claim, it does not reach Plaintiff's contention that "a consumer cannot be compelled to arbitrate warranty claims under the Magnuson–Moss Warranty Act unless the arbitration clause is contained in the warranty itself." (Opp'n, Doc. 12 at 20).

dismissed. *See Monopoli*, 2022 WL 409484 at *6 (dismissing MMWA claim for failure to include 100 named plaintiffs); *Sowa*, 764 F. Supp. 3d at 1278 (same).

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Compel Arbitration and Dismiss or, in the Alternative, to Stay Action [Doc. 8] is **GRANTED**. The parties are **ORDERED** to submit this case to arbitration. It is **FURTHER ORDERED** that this action is **STAYED** and shall be **ADMINISTRATIVELY CLOSED** pending completion of arbitration pursuant to the arbitration provisions in this case. The parties shall notify the Court upon completion of arbitration, and either party shall have the right to move to reopen this case to resolve any remaining issues in contention that may properly be raised before the Court, including enforcement of the arbitrator's decision.

**IT IS SO ORDERED** this 28th day of August, 2025.

Honorable Amy Totenberg
United States District Judge

18